Filed 1/22/15  P. v. Preston CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>JASON RICHARD PRESTON,<br><br>  Defendant and Appellant. | 2d Crim. No. B255786<br>(Super. Ct. No. SA082806-02)<br>(Los Angeles County) |

> Jason Richard Preston appeals his conviction, by jury, of three counts of first degree residential robbery (Pen. Code, § 211),[1] first degree burglary (§ 459), possession of a firearm by a felon (§ 29800, subd. (a)(1)), assault with a firearm (§ 245, subd. (a)(2)), and three counts of false imprisonment.  (§ 236.)  The jury further found that a principal was armed with a firearm during the commission of the offenses and that appellant personally used a firearm.  (§ 12022, subd. (a)(1); § 12022.5, subd. (a).)  The trial court sentenced appellant to 29 years, 8 months in state prison.  He contends the evidence was insufficient to establish his identity as a perpetrator of the offenses.  Two victims identified appellant as one of the intruders and circumstantial evidence tied him to property stolen during this home-invasion robbery and burglary.  Accordingly, we affirm.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

1

*Facts*

Louise Perri-Fulchiero lived with her 18-year old son, Christopher, in Culver City. She sold puppies from her home. In July 2012, Perri-Fulchiero bought furniture from a store operated by Brian Gilman. Gilman and his wife delivered the furniture to Perri-Fulchiero's home. They visited the house two more times that year, to buy puppies.

On the night of December 14, 2012, Perri-Fulchiero left Christopher in his bedroom, playing video games, and went across the street to a neighbor's house with her employee, Angelica Santis. They used the neighbor's kitchen sink to bathe some of Perri-Fulchiero's puppies.

While they were gone, Christopher was playing video games in his room with his headphones on. He suddenly noticed a man standing in his doorway pointing a semiautomatic pistol at him. The intruder threatened to kill Christopher if he did not get on the floor. The intruder tied Christopher's hands behind his back using a zip tie and asked Christopher, "Where's the safe?" A second armed intruder entered the room and began to choke Christopher, telling him, "Don't you fucking lie to me." The second intruder was taller than the first. Christopher showed the intruders into his mother's bedroom where her safe was stored in the closet. The first intruder, later identified as Richard Pruden, picked up the safe while appellant rummaged through the dresser drawers.

Perri-Fulchiero and Santis eventually noticed a strange vehicle blocking Perri-Fulchiero's driveway and went back across the street, to investigate. Within a few moments, each woman was pulled inside by the intruders. Their hands were zip-tied behind their backs and each woman was forced to lie, face down, on the living room floor. Appellant told Perri-Fulchiero he was a "trained killer" and threatened to shoot her if she did not cooperate. Pruden demanded that Perri-Fulchiero show him the wall safe. When she told him there was no wall safe, Pruden replied that there was supposed to be one and then went back to rummaging through the house. Appellant, who was watching the victims, eventually said, "Richard, let's go." Pruden returned to the living

2

room. The two had a short conversation and appellant left through the front door with Perri-Fulchiero's Louis Vuitton purse. Pruden waited inside until the vehicle's engine started. Then, he left with the safe.

After she heard the vehicle drive away, Perri-Fulchiero made her way outside. When she reached the street, she saw her neighbor lying face down in the middle of the street. He explained that he left his own house to check on Perri-Fulchiero after she failed to return to take care of the puppies in his kitchen. Appellant accosted Miller when Miller reached the end of his driveway. Pointing his gun at Miller, appellant described himself as a trained killer and ordered Miller to get down on the ground.

The safe taken by appellant and Pruden contained many items of sentimental value and a large collection of custom handmade jewelry Perri-Fulchiero inherited from her father, who had a long career as a jeweler in Beverly Hills. The gold, diamonds and platinum in the safe had a retail value of over one million dollars. Some of the jewelry was stored in a navy blue crown royal bag. Other items were stored in a burlap tie bag and in a gold satchel. Appellant also stole Perri-Fulchiero's wallet, containing her driver's license, credit and ATM cards and other items.

*Identification Evidence*

Edward Baskaron, the Culver City police officer who first responded to the crime scene, asked the victims to describe the intruders. His first written description of appellant was, "White male, approximately six-foot two tall, wearing a hat, scruffy beard, black shirt, blue jeans, possibly wearing a wig under the hat." Perri-Fulchiero initially described appellant as having some facial hair or something dark on his face. Santis said he had a skin condition like acne and was wearing gloves, a dark wig, a hoodie and jeans. She also thought appellant looked as if he was missing a tooth. Miller, the neighbor, said that appellant had shoe polish or something dark on his face and that he was wearing a brown curly wig under a beanie and a dark coat. Christopher gave a similar description. He said the taller intruder, later identified as appellant, was wearing a wig and had something dark, like charcoal, on his face. He thought the robber might have been wearing a beanie, but later said he thought it was a hood. None of the victims described

3

appellant has having scars on his face, tattoos or bandages on his hands. The victims also told Officer Baskaron the robbers were driving a "red or orange newer model SUV, or crossover, possibly Chevrolet."

One week after the incident, Christopher identified appellant in a photographic line up. Perri-Fulchiero and Santis were both shown a photographic line up, but neither witness was able to identify appellant. Perri-Fulchiero and Christopher saw appellant in the courtroom at his preliminary hearing and identified him as the taller intruder. They also identified appellant at trial. Santis testified that she did not see the intruder in the courtroom. Miller did not identify appellant from the photographic line up, but wrote that appellant's photograph "could be one of the suspects as well." Miller could not "say with 100 percent certainty" that appellant was the person who accosted him, although he testified that appellant was the same race and height as the perpetrator.

Jamie Arthur, a woman with whom appellant had a relationship, tied appellant to both Gilman and Richard Pruden, the shorter of the two intruders. On December 15, appellant sent Arthur a text saying he had "a lot of $diamons. . . ." When she saw appellant on December 16, his fingers were wrapped in bandages because he had an infection. In appellant's hotel room, Arthur saw a gold and diamond bracelet with the name "Louise" on it. On December 17, Arthur helped appellant pawn several pieces of jewelry that appellant carried in a purple crown royal bag. After Pruden was arrested, appellant told Arthur that he believed he was being followed. He later told Arthur that he had gone his separate way from Gilman.

Another witness, Jeffrey Duvall, testified that he was friends with Gilman, appellant and Pruden. Appellant told Duvall that he and Pruden had committed a home invasion robbery during which they stole a "bunch" of jewelry and a smaller amount of cash. Duvall told police that he had seen appellant driving a red, Dodge SUV and that appellant always carried a gun. On December 23 and 24, 2012, Duvall was at Gilman's house in Arizona with Gilman, appellant and some others. When Duvall said he wanted to go back to California, appellant asked Duvall to drive his rental car and return it to one of appellant's girlfriends. Duvall agreed. Appellant also gave Duvall the keys to his

4

Dodge SUV. He asked Duvall to take the Dodge from the storage unit where it was parked and to drop it off in Compton or Carson, so someone would steal it. Duvall, however, broke the key to the storage unit, so he never retrieved the Dodge.

Appellant rented the Dodge SUV from Hertz using a driver's license in the name of James Dewitt. Hertz later reported it as stolen. In January 2013, Culver City police officers recovered the vehicle from a storage unit in Carson. The unit was rented to Brian Gilman. Richard Pruden was an authorized user of the unit. It had last been accessed on December 15, 2012.

In January 2013, appellant sold pieces of jewelry to a jewelry store and gold buying business in Centennial, Colorado. He used a Colorado identification card with his true name on it for both transactions.

A few days later, appellant was arrested following a traffic stop in Tennessee. He gave the Tennessee sheriff's deputy a California driver's license in the name of James Dewitt. At the time, appellant was driving a rented Jeep Liberty with a Colorado license plate that was packed with bags and suitcases. A search of the vehicle disclosed five cell phones, a handgun and a wig. The officers also found a cache of documents in different names including appellant's true name, his alias of James Dewitt, Richard Pruden and Brian Gilman. In addition, the officers found a large amount of jewelry, and a blue satin crown royal bag.

*Standard of Review*

Appellant contends the evidence is insufficient to establish his identity as one of the perpetrators. Our standard of review is settled. To assess the sufficiency of the evidence, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. (*People v. Maury* (2003) 30 Cal.4th 342, 403 (*Maury*).) The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Id.* at p. 396 . . . .) In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support

5

of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. ([*People v. Boyer* (2006)] 38 Cal.4th [412,] 480 . . . .) 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' (*Maury, supra,* at p. 403 . . . .) A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331 . . . .)" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

In determining whether substantial evidence supports the jury's verdict, we may not re-weigh the evidence or second guess credibility determinations made by the jury. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convicted of the defendant's guilt beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054.) "Simply put, if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Foreman* (2002) 28 Cal.4th 107, 143.)

Unless the testimony is "physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1148, 1181.) This rule applies with equal force to evidence of identity. "Identification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime." (*People v. Boyer, supra,* 38 Cal.4th art p. 480.) " '[T]o entitle a reviewing court to set aside a jury's finding of guilt the evidence of identity must be so weak as to constitute practically no evidence at all.' " (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 521, quoting *People v. Lindsay* (1964) 227 Cal.App.2d 482, 493.)

6

*Discussion*

Appellant contends there is no substantial evidence of his identity as one of the intruders. He points out that no forensic evidence tied him to the crime and that the victims failed to describe many of his distinguishing physical characteristics: two prominent facial scars; a tattoo around his wrist and thick bandages on his hands. Perri-Fulchiero and Santis testified the taller intruder was wearing gloves during the robbery. However, the clerk who rented appellant a hotel room on the night of the robbery testified that his bandages were too thick to wear under gloves. Santis testified the intruder might have been missing a tooth; appellant has all of his teeth. The victims described the intruder as having acne, a skin condition or something like shoe polish on his face. Appellant does not have acne. The victims also described the intruder as being skinny. By the time of trial, appellant had gained weight and was not skinny. The victims described the intruders as driving a red SUV that was probably a Chevrolet, but the only red SUV associated with appellant was a Dodge.

Appellant also claims the victims' testimony identifying him was inherently unreliable. Christopher selected his photograph from the photo line-up, but initially selected another photograph.[2] Perri-Fulchiero and Santis failed to identify anyone from the photographs. Appellant contends Perri-Fulchiero's in-court identification of him is inherently unreliable because it was made in the suggestive setting of the courtroom at his preliminary hearing.

Finally, appellant points out that Jeffrey Duvall, a prosecution witness, also matches the victims' descriptions of the taller intruder. Duvall was also acquainted with both Gilman and Pruden, is missing front teeth and has both acne and skin cancer. He is

---

[2] This contention overstates the matter. Christopher selected appellant's photograph (Photo No. 4) immediately and was certain of his identification. When the detective asked Christopher to write down his selection on the form provided, Christopher wrote the word "same" on the line designated for Photo No. 1, rather than the line for Photo No. 4. He realized his mistake, crossed out the single word he had written and then wrote, on the line for Photo No. 4, "Same face, same facial hair, same nose, same shape of face, same look on his face."

tall and skinny and has curly hair. Duvall also has prior felony convictions for robbery and burglary. Perri-Fulchiero and Christopher both testified that Duvall was not one of the intruders. In addition, Duvall is older than the intruders identified by the victims and has difficulty walking due to his cancer.

Each of appellant's factual contentions finds some support in the record. They do not, however, persuade us that the verdict is unsupported by substantial evidence. Christopher Fulchiero identified appellant from his photograph and in court. His testimony, if credited by the jury, constitutes substantial evidence of appellant's identity as the intruder. Perri-Fulchiero also identified appellant. The jury was aware that her identification was made in an inherently suggestive setting, but nevertheless decided to credit it. Similarly, the victims did not describe the intruder as having facial scars, a tattoo or bandages on his hands. They did testify that he appeared to have a skin condition or to have smeared shoe polish on his face. Two of the three victims said he was wearing gloves. A reasonable jury could have concluded appellant removed some or all of his bandages before donning gloves, and that he obscured his facial scars by smearing something dark on his face.

Appellant's conduct after the robbery is also consistent with his identification as one of the intruders and constitutes additional substantial evidence in support of the verdict. On the night of the robbery, appellant sent a text message to a girlfriend, bragging that he had "lots of $diamonds." He spent the next two days pawning or selling jewelry stolen from Perri-Fulcherio. Appellant sold more of the stolen jewelry as he drove through Colorado and had still more in his possession when he was arrested nearly four weeks later in Tennessee. Appellant used a fake driver's license to rent an SUV similar to the one described by the victims. He never returned the SUV which was later recovered from a storage unit that Gilman rented the day after the robbery. Appellant's accomplice, Richard Pruden was an authorized user of the storage unit. Appellant told Duvall he had been involved in a home-invasion robbery and also asked Duvall to retrieve the SUV and dispose of it.

8

A reasonable jury could have found that appellant was the taller intruder based on, among other evidence, Christopher's identification testimony, the descriptions given by the remaining victims, the evidence linking appellant to Gilman and Pruden, the statements he made to Duvall, and his possession of jewelry stolen from the Perri-Fulcherio home. These circumstances reasonably justify the jury's findings. The fact that they might also reasonably be reconciled with contrary findings does not warrant a reversal of the judgment. (See, e.g., *People v. Jones* (2013) 57 Cal.4th 899, 961; *People v. Abilez* (2007) 41 Cal.4th 472, 504.)

*Conclusion*

The judgment is affirmed.

NOT TO BE PUBLISHED.

YEGAN, J.

We concur:

GILBERT, P.J.

PERREN, J.

9

Antonio Barreto, Jr. , Judge

Superior Court County of Los Angeles

_____

Julie Schumer, under appointment by the Court of Appeal, for Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Keith H. Borjon, Supervising Deputy Attorney General, Jaime L. Fuster, Deputy Attorney General, for Plaintiff and Respondent.